## ORIGINAL

**GREENBERG TRAURIG LLP**
Mark G. Tratos (Bar No. 1086) (*Local Counsel*)
F. Christopher Austin (Bar No. 6559) (*Local Counsel*)
Ronald D. Green, Jr. (Bar No. 7360) (*Local Counsel*)
3773 Howard Hughes Parkway, Ste. 500 N
Las Vegas, Nevada  89109
Tel: (702) 792-3773
Fax: (702) 792-9002

**KRONENBERGER & ASSOCIATES**
Karl S. Kronenberger (CA Bar No. 226112) (*Pro Hac Vice*)
Terri R. Hanley (CA Bar No. 199811) (*Pro Hac Vice*)
220 Montgomery Street, Suite 1920
San Francisco, California 94104
Tel:  (415) 955-1155
Fax:  (415) 955-1158

Attorneys for Plaintiff



2005 JUL 12  A 10: 39

CLERK ... COURT
DISTRICT OF NEVADA

BY____ **MZ** ____DEPUTY

# FILED SEPARATELY

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

# SEALED

CV-S-05-0848-RCJ-LRL

**ST. MATTHEW'S UNIVERSITY (CAYMAN**
**LTD., a Cayman Islands company,**

       Plaintiff,

  vs.

**ASSOCIATION OF AMERICAN**
**INTERNATIONAL MEDICAL**
**GRADUATES, INC., a Nevada**
**corporation; THOMAS MOORE, M.D.**
**a.k.a. "presaaimg@hotmail.com," an**
**individual; SARAH B. WEINSTEIN a.k.a.**
**"execsecaaimg@hotmail.com," an**
**individual; and RACHAEL E. SILVER,**
**an individual,**

       Defendants.

*EX PARTE* **MOTIONS FOR:**

1. **PRESERVATION ORDER,**

2. **EXPEDITED DISCOVERY,**

3. **FILING UNDER SEAL, AND**

4. **CONSOLIDATED HEARINGS;**

**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT.**

# SEALED

Plaintiff ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD. ("ST. MATTHEW's"),

through its attorneys, pursuant to Local Rules and the inherent powers of this Court,

hereby brings *ex parte* motions for the issuance of orders for Preservation of Evidence;

Expedited Discovery; Filing Under Seal; and for consolidated hearings thereon.

CONSOLIDATED *EX PARTE* MOTIONS

**2**

1   ST. MATTHEW's seeks these motions on an *ex parte* basis as the sole means of

2   preserving necessary evidence and the proper identification and service of process upon

3   parties hereto, both necessary to the fair, accurate, and efficient resolution of this case.

4   These motions are brought and supported by the papers and pleadings attached

5   hereto, and by the attached Memorandum of Points and Authorities In Support.

6

7   DATED: July 8, 2005.          **KRONENBERGER & ASSOCIATES**

8

9                                By: _____

10                                    Karl S. Kronenberger
                                     Terri R. Hanley
11                                   Attorneys for Plaintiff
                                     ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.
12
     DATED: July ll , 2005.        **GREENBERG TRAURIG, LLP**
13

14

15                                By: _____
                                     Mark G. Tratos
16                                   F. Christopher Austin
                                     Ronald D. Green, Jr.
17                                   Designated Local Counsel for Plaintiff
                                     ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.
18

19

20

21

22

23

24

25

26

27

28

                                        2                    **CONSOLIDATED *EX PARTE* MOTIONS**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

### Introduction

In connection with the attached verified Complaint (the "Complaint"), filed herewith and incorporated herein by reference[1], Plaintiff ST. MATTHEW's seeks the following orders, with the common and collective goal of preserving the integrity and existence of crucial and volatile evidence necessary for the fair and efficient resolution of the case at hand:

- **Preservation Order:** an order preserving now-existing electronic evidence in the possession, custody and/or control of non-parties, which is subject to intentional, inadvertent, and/or automated deletion;

- **Expedited Discovery Order:** an order allowing the immediate discovery of identifying information sought in the attached non-party subpoenas and other subpoenas to follow, required for the full and accurate identification and location of defendants;

- **Order for Filing Under Seal:** an order allowing the attached verified Complaint, this motion, and any and all other papers in submitted in the case, as well as the case docket and any orders issued, to be filed under seal, to protect against notice of this action to as yet unidentified parties and non-parties shown to be highly likely to destroy evidence or evade service, discovery and identification; and

- an order for a consolidated hearing on these matters.

Plaintiff further seeks the above motions (collectively, the "Motions") – which serve merely to preserve evidence and identify parties – on an *ex parte* basis, as Plaintiff has alleged and shown, and will prove at trial, that Defendants operate using fraud and deception designed to evade identification, discovery, service, and civil and criminal liability, including using false names and corporate identities, non-operating addresses,

---

[1] The filing of Plaintiff's Complaint is conditioned by Rule and election upon the Plaintiff's Motion to File Under Seal, *infra.*

**CONSOLIDATED *EX PARTE* MOTIONS**

1  and misrepresentations regarding their personal and corporate existences.  Plaintiff has

2  also alleged and shown the Defendants have acted as a matter of course in a way to

3  purposely avoid being located and to "hide their tracks" regarding their unlawful activities

4  upon which this lawsuit is predicated. Given this blatant propensity on the part of

5  Defendants for deception and evasion, the relief sought must be granted with no notice to

6  Defendants.

7      While argument and legal authority are laid out in turn for each of the above

8  requests, facts in common to all are stated directly below.

9                          **COMMON FACTS**

10     As detailed in the attached verified Complaint, incorporated herein by reference,

11  Plaintiff has for the last three years been the targeted subject of false and defamatory

12  statements directed at it by Defendants, operating using pseudonyms and false

13  information and via an Internet website.

14     Plaintiff ST. MATTHEW's, a private medical school located in the Cayman Islands,

15  British West Indies, is hugely reliant upon its academic reputation in the medical

16  community, both for its enrollment and for the post-graduate placement of its students in

17  medical residencies throughout the U.S. and around the world.

18     Defendants have preyed upon this fact by publishing a website ("AAIMG.com")

19  defaming Plaintiff in the quality of its educational services, posting fabricated and falsely

20  critical results of a purported in-depth, on-site inspection it claims to have conducted of

21  Plaintiff ST. MATTHEW's.  A true and correct copy of Defendant AAIMG's website is

22  attached hereto as Exhibit "A".  Plaintiff ST. MATTHEW's has alleged on information and

23  belief that such an inspection never took place, and the publication of these falsehoods

24  prompted ST. MATTHEW's to investigate their source. Compl. at ¶¶34-67.

25     Defendant AAIMG claims – and at first blush appears – to be a non-profit,

26  independent "association" of Americans who are graduates of international medical

27  schools.  Their self-stated agenda is to further the acceptance in the American medical

28  community of foreign-schooled doctors.  Ex. A at 2.  Strangely, the <u>only</u> activity

**CONSOLIDATED *EX PARTE* MOTIONS**

1  undertaken to advance this agenda is the above-mentioned posting of "results" of

2  purported site inspections of various foreign medical schools, with an unexplained original

3  and particular focus on the Caribbean region.  Ex. A at 4.

4      Defendant AAIMG has achieved a notable and disturbing level of recognition in the

5  American medical educational community, with many prestigious institutions such as

6  Cornell University and Harvard Medical School linking to the AAIMG website as reference

7  material for medical school applicants and hospitals reviewing applications for

8  residencies.  (*See attached list of websites linking to "aaimg.com," attached hereto as*

9  Exhibit B.)

10      Plaintiff deems Defendant AAIMG's notoriety "disturbing" in that thorough

11  independent investigation contracted by ST. MATTHEW's has revealed a much more

12  nefarious and subversive – and unlawful – reality regarding Defendant AAIMG:

13      ▪ This "association" has no members, and no way to join;

14      ▪ The <u>only</u> operation of AAIMG is a single, twelve-page website purportedly

15        managed and hosted out of Russia (*see* Ex. A);

16      ▪ The only contact information provided on AAIMG's website: is a non-

17        operational mail-drop service address in Nevada, and two Hotmail email

18        addresses[2] attributed to each of two listed officers of AAIMG (Ex. A at 43);

19      ▪ With no staff, no capital, and no apparent source of income, AAIMG claims to

20        have conducted no less than 25 intensive, on-site investigations around the

21        globe, such investigations having been shown to cost approximately $50,000

22        each (*See* Ex. A at 11-20; Compl. at ¶63.)

23      ▪ AAIMG turns out to be a standard Nevada for-profit corporation, but lists no

24        actual operating address (only that of a corporate services office, VAL-U-CORP

25        Services, Inc. ("VAL-U-CORP"), of Nevada);

26

27    [2] Hotmail email addresses are free, publicly available Internet-based email accounts that

28  require no personal or verifiable information for registration, and can be accessed from
    any computer with a web browsing program and an Internet connection.

**CONSOLIDATED *EX PARTE* MOTIONS**

- AAIMG gives no actual address for any of the three officers it lists (individual Defendants),but instead lists the address of VAL-U-CORP.

- A full-blown investigation by an international private investigatory firm has not been able to locate the only two individuals identified on the AAIMG website – Defendants Thomas Moore, M.D., (AAIMG President) and Sarah Weinstein (AAIMG Secretary) – nor the third individual Defendant, Rachael Silver (AAIMG Treasurer).

- There are only 28 Thomas Moore, M.D.s listed with the American Medical Association.[3]  <u>None are graduates of international medical schools</u>.  Of those 28 Thomas Moore, M.D.s, nine have been found not to be the man pictured on AAIMG's website, leaving only 19 possible matches in all of the United States. Each of those 19 gentlemen have listed affiliations with professional medical practices in various U.S. States – <u>none to AAIMG</u>.

Furthermore, regarding the only two operational, identifiable aspects of AAIMG – the two Hotmail email addresses[4] attributed to Defendants Moore and Weinstein – Plaintiff's investigations have revealed the following:

- <u>Both</u> email accounts are routinely accessed from the same location by the same user account;

- Email sent to one account has been responded to from the other;

- The Hotmail accounts are often accessed from anonymous, public Internet access locations across the country, such as Internet cafés, hotels, and trade shows; the only access points consistent with residential or small-business Internet access accounts are clustered around Boston and Florida.[5]

---

[3] The American Medical Association indexes all medical doctors licensed in any of the United States or Territories.

[4] The metadata for the aaimg.com website shows an original contact email address of "aaimg@yahoo.com," which is not referenced in the website, and appears to be defunct. Plaintiff seeks discovery regarding this email account to verify its status and origination information, *infra*.

[5] These key access point identifications are the primary focus of the discovery sought in the attached subpoenas, to identify the holders of the accounts used to by Defendants.

6

CONSOLIDATED *EX PARTE* MOTIONS

1
2
3
4

- AAIMG's website warns that it may take several days for responses to be sent to emailed inquiries – a necessary arrangement for someone waiting to access Hotmail accounts while traveling or from Internet cafés in order to avoid being tracked or traced.

See also, Compl. at ¶¶34-67.

All of these factors converge to create the undeniable inference that, far from being the well-funded, altruistic professional institution it claims to be, AAIMG is instead primarily a single individual, operating a bare-bones website, using fabricated identities and corporations with fictitious officers, employing anonymous, randomized account access, all in a concerted effort to avoid identification, discovery, and thereby liability.  On information and belief, ST. MATTHEW's alleges, and intends to prove that this farce of an operation is either shielding a "shake-down" artist (or artists) looking to extort money from injured institutions -- acts of which they have been publicly accused – or more sinister, shielding one of more individual administrators of a competing Caribbean medical school. Either way, ST. MATTHEW's intends to ferret out the person or persons truly responsible and bring to them answer before this Court.

While Plaintiff ST. MATTHEW's has suffered actual and extensive injury as a result of the public's reliance on AAIMG's bogus operations, it is certainly not the only victim. Many other small medical schools have been defamed and similarly injured (Ex. A at 14-20) – though noticeably absent are several – related – key competitors of Plaintiff, who instead are conspicuously lauded rather than panned.  (Ex. A at 11-13.)

Public policy concern also exists in that, for years, AAIMG has been the subject of intense suspicion and discussion in many online discussion boards for medical students, graduates, and prospective students – some of whom were directly and personally injured by AAIMG's negative "reviews" of their schools, and often calling for an investigation into AAIMG, or at the very least, a disclosure of their accreditations and affiliations, which never came – until now.  (*See attached* Exhibit C *for examples.*)

**CONSOLIDATED *EX PARTE* MOTIONS**

1    On its own behalf, on behalf of its student body past, present and future, on behalf

2    of the other medical schools injured, of behalf of international medical students

3    everywhere, and in the interest of justice, every effort must be taken to identify the

4    perpetrators of this continuing wrong-doing and bring them to answer for their actions.

5

6    **I.      ORDER FOR PRESERVATION OF EVIDENCE REQUIRED**

7    In light of the above-stated and referenced facts, Plaintiff ST. MATTHEW's has a

8    considerable and justified concern that, upon any notice or service of any motion or

9    summons in the present action[6], Defendants will act quickly and untraceably to destroy

10   any evidence – particularly electronic evidence – in their possession or under their

11   control. Furthermore, the evidence at issue is subject to automated deletion by the non-

12   parties in possession.

13   As such, the evidence at issue is under a specific, significant, and imminent threat

14   of loss sufficient to require the issuance of the order sought.

15   Plaintiff therefore seeks an order preserving the any all information regarding

16   AAIMG, the email addresses "presaaimg@hotmail.com," "execsecaaimg@hotmail.com,"

17   and "aaimg@yahoo.com," and the domain name "aaimg.com," to be served together with

18   those non-parties subpoenas attached hereto as Exhibit "D." The evidence sought

19   therein is crucial and necessary to the fair and effective resolution of this matter, and an

20   order preserving the existence of such information for future discovery is crucial as there

21   exists a high likelihood that such evidence will be intentionally and/or automatically

22   destroyed, particularly the electronic evidence under the control of third parties.

23   **a.  This Court has inherent power to order preservation of evidence.**

24   It is recognized that Courts have the inherent power to take action to preserve

25   evidence, a power akin to administering membership of the bar and dismissing cases for

26   failure to prosecute. *See Pueblo of Laguna v. United States*, 60 Fed.Cl. 133 (Fed.Cir.

27   _____

28   [6] Federal law, as well as many subscriber agreements, requires that ISPs provide notice to an account subscriber that their personal information is being sought by subpoena or by court order. *See, e.g.* 47 U.S.C. § 551(c)(2)(B) (2005).

8

**CONSOLIDATED *EX PARTE* MOTIONS**

2004); *Capricorn,* 220 F.R.D. at 432-3 ("[M]otions for preservation of documents or things and orders granting such motions have become widely used <u>in place of restraining orders or injunctions</u>. . . . It must also be recognized that district courts have the power to control the discovery process and overall case management.") (*emphasis added*).

It is notable that the only Federal Court to have published a comprehensive opinion addressing the issuance of preservation orders noted a particular and pressing need for such an order in cases such as the present one, where electronic evidence is subject to the inadvertent or systematic deletion by non-parties.  *See Capricorn Power Company, Inc. v. Siemens Westinghouse Power Corp.,* 220 F.R.D. 429, 431-6 (W.D.Penn. 2004):

> "The Court notes that orders directing parties to preserve materials or documents are common in circumstances in which evidence is subject to being destroyed or lost in routine and sometimes not-so-routine deletion or destruction of information in various mediums. . . . Such a situation may require immediate action by the court to preserve such electronic evidence at least temporarily in order that the parties may have an opportunity to confirm that such evidence is relevant to the claims before the court."

**b. Evidence Sought Subject to Intentional and Automated Deletion.**

Plaintiff has shown above, and alleged in the attached verified Complaint, that Defendants have acted in a purposeful and consistent manner indicating an intention to evade detection, identification and liability.  Their fraudulent practices are evidence of the high likelihood that, upon notice of this action, Defendants will act to destroy or hide evidence.

In addition to preventing the intentional destruction of evidence, the order seeks to prevent the automated, scheduled account and content deletions carried out by many ISPs and email account providers, including Hotmail and Yahoo, which commonly have automatic data deletion procedures based on the age, location, and usage levels of accounts and their contents, independent of any actions by the account user.  Cable Internet service providers, for example, are required by Federal law to delete subscriber

**CONSOLIDATED *EX PARTE* MOTIONS**

1   data upon certain events, such as the closing of the account.  *See* 47 U.S.C.

2   § 551(e) (2005).

3   ### c.  Balance of Interests Test Strongly In Favor of Issuing Order.

4   While case law on preservation orders is extremely scarce, and while this Circuit

5   has not spoken to any test regarding them, the Western District of Pennsylvania in 2004

6   conducted a thorough survey and analysis of the pertinent law, and distilled from it a

7   three-factor balancing test, urging its adoption in other Federal Circuits.  *Capricorn,* 220

8   F.R.D. at 433-434.  Plaintiff applies this test to the present case, as the most

9   comprehensive test available, and shows below the outcome strongly favors issuance:

10   ### 1.  First Factor: Court's level of concern in maintaining existence and

11   ### integrity of evidence in absence of an order favors issuance.

12   This first factor looks to the past, present, or future threat of the continuing

13   existence, or integrity of, evidence relating to the case.  *Capricorn* at 434-435.  Of the

14   three situations noted by the court where a preservation order would be effective, two are

15   clearly present here: (1) that evidence is outside the possession of all parties, creating a

16   concern for its continued existence, and (2) the "basis for concern" that a party would

17   destroy or damage evidence.  As explained above, Defendants (named and unidentified)

18   have been shown to have the propensity for evasion and deception, and it is highly likely

19   that they will act to destroy evidence upon notice of legal action; also, the evidence

20   sought is subject to automated and routine deletion by the non-party service providers

21   identified.  As such, this prong distinctly favors granting of the order.

22   ### 2.  Second Factor: Possibility of Irreparable Harm In Absence of

23   ### Preservation Order Sought Strongly Favors Order.

24   The second factor decidedly favors Plaintiff, as it has shown that the evidence

25   sought is Plaintiff's only means by which to identify and locate parties to this suit, both

26   named and as yet unidentified.[7]  In *Capricorn,* the Court noted of this second factor that

---

27   [7] See *Capricorn* at 435, noting second factor favors issuance where "[t]he loss or

28   destruction of certain evidence can result in significant prejudice to the party seeking to
use it in proving the party's claims."

CONSOLIDATED *EX PARTE* MOTIONS

1   "certain evidence may be so integral and essential to a party's case that an order of

2   preservation . . . may be required, <u>even in the absence of a threat of imminent, significant</u>

3   <u>harm to the integrity or existence of the evidence</u>," indicating that this factor holds greater

4   weight in the balancing test than that of the first factor. *Capricorn* at 435 (*emphasis*

5   *added*). In such a case, that Court held "it becomes a judicial <u>duty</u> to protect a party from

6   likely harm by acting to prevent the loss or destruction of evidence, thereby ensuring that

7   the party may prosecute or defend its case in a court of law." *Id.* (*emphasis added*).

8                    **3.   Third Factor: Ability to Maintain and Preserve Evidence.**

9           The third and final factor also favors Plaintiff. This factor looks to the physical

10   ability of persons to preserve the evidence at issue, and the burden of an order thereon.

11   *Capricorn* at 435-436. The order sought places <u>no</u> burden upon Defendants, as the

12   information sought is not in their possession nor consumptive of their resources. As to

13   the burden upon non-parties, it is minimal, being of an electronic nature and capable of

14   being "backed-up" to removable media (such as CD-ROMS) at minimal expense, which

15   costs will be paid for by Plaintiff.[8]

16           It is clear, therefore, that Plaintiff meets this very comprehensive and fairly-

17   balances test, as all factors weigh strongly in favor of Plaintiff; as such, the order sought

18   should issue as against any party in possession of the evidence sought in the subpoenas

19   at issue.

20   **II.      ORDER FOR EXPEDITED DISCOVERY**

21           As the facts stated above make clear, Plaintiff requires the verification and/or

22   discovery of the identities and locations of Defendants in order to effectuate proper

23   service upon the parties responsible for the wrongs alleged. Pursuant to Rule 26, good

24   cause showing as to why such relief is needed, Plaintiff ST. MATTHEW's hereby moves

25   the Court to allow for the immediate discovery, in advance of the required Rule 26(f)

26

27   [8] For example, Hotmail has in place a standard procedure for the backing-up and
    recording of electronic data sought by order or subpoena, and charges a minimal
28   "preservation fee" for the data to be stored on disc and preserved for production upon
    order.

**CONSOLIDATED *EX PARTE* MOTIONS**

1  meeting on discovery, sought in the subpoenas attached hereto as Exhibits "D" and "E"

2  (the "Subpoenas"),[9] and such further subpoenas as are required to obtain identifying

3  information discovered by the Subpoenas.

4         **a. Expedited Discovery Necessary For Proper Pleading and Service**

5         Expedited discovery is allowed where "good cause" is given by a showing that the

6  need for discovery outweighs any possible prejudice to the party from whom discovery is

7  sought.  *See Semitool, Inc. v. Tokyo Electron America, Inc.* 208 F.R.D. 273, 276

8  (N.D.Cal. 2002).  As explained above, and in the attached Complaint, Plaintiff has great

9  need for the immediate discovery of the identifying information sought, which is

10 necessary to properly plead its case and serve process upon both named and as yet

11 unidentified Defendants.  The scope of Plaintiff's requested discovery is limited to this

12 need.

13        In fact, it has been noted that "[e]xpedited discovery may also be appropriate in

14 cases where physical evidence may be consumed or destroyed with the passage of time,

15 thereby disadvantaging one or more parties to the litigation."  *Qwest Communications,*

16 *Int'l, Inc., v. World Quest Networks, Inc.* 213 F.R.D. 418, 419 (D.Colo. 2003), *citing Pod-*

17 *Ners, LLC v. Northern Feed & Dean of Lucerne Ltd. Liability Co.,* 204 F.R.D. 675, 676

18 (D.Colo. 2002).  As shown above, not only is the discovery sought necessary to further

19 these proceedings, but it is also at considerable risk of automated or intentional deletion

20 by Defendants and custodial non-parties.

21        Good cause may also be found where the moving party has asserted claims of

22 infringement and unfair competition.  *See, e.g., Energetics Systems Corp. v. Advanced*

23 *Cerametrics, Inc.,* 1996 WL 130991, *2 (E.D.Pa.1996).

24

25

26

27 [9] To note: for sake of brevity, only the first page of the form of Rule 45 subpoenas are

28 attached for the Court's reference; the blank proof of service and instruction attachments have been omitted for space consideration, but will be served upon the recipients.

**CONSOLIDATED *EX PARTE* MOTIONS**

**b. There is <u>NO</u> burden to either the parties from whom discovery is sought, or to the Defendants.**

Plaintiff seeks merely identifying information from non-party sources for the purpose of pleading and service.  As explained above, this information – most all of it in digital format – can be, and often is, digitally copied, backed-up, and stored for future production at little to no cost, or at a minimal cost for which Plaintiff will reimburse the appropriate parties.  As to the Defendants, the information sought is not in their possession, and the storage and/or production process would impose absolutely <u>no</u> duty or impingement upon their time or resources.

**c. There Is No Constitutional Privacy Right in Account Subscriber Data**

Courts have held that computer users do not have a legitimate expectation of privacy in their subscriber information - such as subscribers' names, addresses, birthdates, and passwords – because they have conveyed it to another person—the system operator. *See Guest v. Leis*, 255 F.3d 325 (6th Cir 2001), *citing United States v. Maxwell*, 45 M.J. 406, 418 (CAAF 1996); *United States v. Kennedy*, 81 F.Supp 2d 1103, 1110 (D.Kan. 2000) (rejecting a privacy interest in subscriber information communicated to an internet service provider); *United States v. Hambrick*, No. 99-4793, 2000 WL 1062039, at *4 (4th Cir Aug 3, 2000) (*unpublished*) (holding that defendant destroyed any privacy interest in his subscriber information when he conveyed it to an internet service provider (*citing United States v. Miller*, 425 U.S. 435, 442 (1976)).

**d. Subpoenas Seek Only Identifying Information**

The Subpoenas are minimally invasive, and carefully drafted to meet Plaintiff's prosecutorial needs, seeking <u>only</u> identifying information regarding accounts used by the Defendants in administering the AAIMG corporation and website.  *See Qwest Comm.*, 213 F.R.D. at 420 (scope of discovery sought should be considered when determining "good cause" showing).  The subpoena recipients fall into two categories:

**<u>Exhibit A: Defendant AAIMG's Website</u>.**

CONSOLIDATED *EX PARTE* MOTIONS

**Exhibit D: Direct Service Providers.**   Those subpoenas attached as Exhibit D (discussed above in the context of the preservation order sought) are addressed to providers of technical and corporate services for Defendants:

- **VAL-U-CORP Services:** The Nevada incorporator for Defendant AAIMG, and also the only listed address for named individual Defendants Moore, Weinstein, and Silver, as well as the only listed "contact" address given on the AAIMG website.  Subpoena seeks only contact information for any individuals or entities connected with Defendant AAIMG.

- **Nausoft LLC; Demkin; Skillen:** The individual and corporate web developers identified on the AAIMG website, as those responsible for the design, development and maintenance of the website's content, and listed as the technical contact on the registration information for the "AAIMG.com" domain name.  Subpoenas seek only contact and billing information connected with the AAIMG website.

- **Everyone's Internet:** The company providing website hosting services for AAIMG and its website.  Subpoena seeks account user data, including origination information, contact and payment source information, all seeking to identify those directly responsible for the operation and maintenance of the AAIMG website.

- **Hotmail (Microsoft) and Yahoo!:** The two Internet-based email account providers known to host email accounts used by Defendants to operate and administer the AAIMG website.  While Plaintiffs will later seek discovery of the content of these accounts, these present subpoenas seek only identifying information, including user contact information, and account creation and access location information.[10]

---

[10] An Internet access point is a computer with access to the Internet.  A user at an Internet access point at any point in time is identified by an Internet Protocol (IP) address, comprised of a dotted decimal notation (for e.g.: "192.168.1.1") that uniquely identifies a particular Internet access point at a certain time.  Free email providers routinely maintain records of IP addresses used to create free email accounts accounts; such IP addresses

**CONSOLIDATED *EX PARTE* MOTIONS**

1    ▪ **Network Solutions; Go Daddy Software:**  The Internet registrars with which

2    the "AAIMG.com" domain name was or is currently registered. Subpoena seeks

3    all contact and billing information connected with the registration and

4    maintenance of the domain name.

5    **Exhibit E: ISPs of AAIMG-Related Accounts.**   Those subpoenas attached as

6    Exhibit E are addressed to Internet service providers ("ISPs") that provided IP addresses

7    and Internet access to the Defendants, or to other not yet unidentified AAIMG agents.

8    The IP addresses in the subpoenas were used by Defendants when Defendants sent and

9    received email from their Hotmail email accounts, as verified by address verification links

10   contained within emails sent to the AAIMG email addresses.  The address verification

11   links served as a "return receipt requested" protocol, which provided Plaintiff with the

12   verified IP addresses used by Defendants when Defendants communicated through their

13   Hotmail email accounts.  While it appears, and shall be verified, that several of these ISP

14   accounts are held by public Internet access providers (such as Internet cafés and hotels),

15   several ISP accounts are of the account type consistent with local, residential and small-

16   business subscribers.

17        These subpoenas seek <u>only</u> identifying user account information, such as contact

18   and billing information, and account creation and access location information (originating

19   IP addresses, explained above).

20        **e. Order Should Therefore Issue**

21        As Plaintiff's have demonstrated a compelling need for the information sought, as

22   the information is necessary to the proper pleadings and service of process in the present

23   case, and as the discovery is carefully drafted to seek <u>only</u> that identifying information

24   necessary to redress those needs, Plaintiff prays the Court issue the order requested.

25

26   will identify the ISPs providing an Internet connection to a particular access point, and
     ISPs in turn can be served with discovery requests to identify those account holders who
27   use the access points.  A further identifying piece of information is a "MAC," or "media
     control access" address, which uniquely identifies the hardware of a user's connecting
28   device.

**CONSOLIDATED** *EX PARTE* **MOTIONS**

## III.   ORDER TO FILE UNDER SEAL

Lastly, pursuant to the above-discussed concerns regarding the propensity of named and (as yet) unnamed Defendants to hide information, evade discovery, and destroy evidence, Plaintiff ST. MATTHEW's seeks an order that these Motions, the attached verified Complaint submitted for *in camera* review, and any subsequent filings in the present case, including the immediate motion, any orders to be issued in the case, and the case register, be filed under seal, pending the identification and service of all proper Defendants to this case, or until such time this Court deems proper to lift such seal, or upon motion properly brought and granted.

## IV.   EFFECTIVE RELIEF MUST AND SHOULD BE GRANTED EX PARTE

### a.  LR 7-5 and Rule 65 Requirements Met

The facts and arguments stated above, combined with those contained in the attached Complaint, constitute the requisite showing of "good cause" and irreparable harm under L.R. 7-5 and Rule 65 of the Federal Rules of Civil Procedure.  By the filing of these Motions, and by the allegations in the attached Complaint, Plaintiff and its attorneys have certified the reasons as to why the relief sought herein must and should be granted on an *ex parte* basis, with no notice to Defendants: should such notice be provided, there is considerable and justified reason to fear the destruction of necessary evidence, hiding of assets, and evasion of service on the part of named and as yet unidentified parties responsible for the unlawful acts upon which this case is predicated.

/ / /

**CONSOLIDATED *EX PARTE* MOTIONS**

**WHEREFORE**, Plaintiff prays that this Court issue the orders requested herein, in the form filed herewith.

DATED: July 8, 2005.        **KRONENBERGER & ASSOCIATES**

By: _Karl S. Kronenberger_____

Karl S. Kronenberger
Terri R. Hanley
Attorneys for Plaintiff
ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.


DATED: July __\\__, 2005.      **GREENBERG TRAURIG, LLP**

By: _____

Mark G. Tratos
F. Christopher Austin
Ronald D. Green, Jr.
Designated Local Counsel for Plaintiff
ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.

**CONSOLIDATED *EX PARTE* MOTIONS**

American Association of International Medical Graduates



**AMERICAN ASSOCIATION OF INTERNATIONAL MEDICAL GRADUATES**

click here to enter

Equal Opportunity
Equal Evaluation
Equal Access



**All Serious Medical Students Need to Read the AAIMG "Words of Wisdom."**

© AAIMG, 2002
**Design and web hosting by OOO Nautilus,  Russia**
**Disclaimer:  OOO Nautilus disclaims any responsibility for the content of this website provided by AAIMG.**

**CQ Counter**

American Association of International Medical Graduates

AMERICAN ASSOCIATION OF INTERNATIONAL MEDICAL GRADUATES

MISSION STATEMENT

# Equal OpportunityEqual Opportunity

The American Association of International Medical Graduates, hereafter referred to as **AAIMG**, was founded in 1992 as a non-profit organization to promote acceptance of United States citizen international medical graduates into mainstream American medical practice.



**AAIMG** recognizes that thousands of highly qualified U.S. citizens are denied admission to medical school each year and must study abroad. Current medical school admission standards in the United States overemphasize the importance of standardized tests and grade point average.

**AAMIG** recognizes that there are many qualities that go into the making of a skilled, compassionate physician. The organization therefore does not define merit solely on the basis of test scores and grades. We support the right of individuals who are denied access to medical education in their own country to seek professional satisfaction by studying medicine outside of the continental United States.

**AAIMG** recognizes that there are layers of prejudice and discrimination that must be overcome in order for American International Medical Graduates to gain fair access to postgraduate training positions and professional employment opportunities.

American Association of International Medical Graduates



AMERICAN ASSOCIATION OF INTERNATIONAL MEDICAL GRADUATES

GOALS OF THE AAIMG



- To serve as an accurate information source for American citizens unable to gain acceptance into medical schools in the United States.

- To encourage training directors and hospitals in the United States to provide clerkship opportunities in the third and fourth year to American citizens studying medicine abroad.

- To promote equality of testing and evaluation of all International Medical Graduates.

- To encourage residency training directors to give equal consideration to qualified American International Medical Graduates for postgraduate training positions.

- To promote equal treatment of International Medical Graduates by all fifty state licensing boards.

- To overcome prejudice in the mainstream American medical community and society at large toward our citizens who study medicine abroad.

American Association of International Medical Graduates

# AMERICAN ASSOCIATION OF INTERNATIONAL MEDICAL GRADUATES

EVALUATION PROCESS

## EVALUATION PROCESS OF INTERNATIONAL MEDICAL SCHOOLS

Alarmed by the world wide proliferation of medical schools recruiting U.S. citizens, in 1999 AAIMG launched a comprehensive study of **Caribbean Basin** medical schools to assist prospective medical students with objective screening criteria and evaluative data. Since that period, evaluations of medical schools catering to American citizens in **Mexico, Central America, the United Kingdom** and **Eastern Europe** have been completed in 2001 and 2003. The small number of schools in the Pacific Basin are no longer operating according to the latest Word Health Organization report.

Initially, the World Health Organization was contacted to verify current listing of all schools in these regions. In some cases, local governments were contact to determine actual physical presence of the medical school and the ability of graduates to be licensed in that country. Marketing materials such as catalogs and web sites were carefully analyzed. Telephone calls were made to recruiting offices by "prospective" applicants with a standard list of questions. In some cases, email correspondence was initiated. Special attention was paid to asking questions that would identify schools willing to deviate from stated admission criteria, especially those medical schools granting advanced standing to allied health care professionals. Additional questions focused on distance learning components of the curriculum as well as fulltime onsite attendance requirements at the basic science campus.



Site visits were made to admission offices by AAIMG members posing as prospective applicants or as an applicant-parent team. "Applicants" visited each basic science campus for tours and interviewed as many students, administrators and faculty members as time constraints permitted. Directors of hospital Medical Education departments and some preceptors were contacted to verify the medical school affiliation and comment on the quality of the medical students in schools under evaluation. An attempt was made to determine if the international medical school made any liaison efforts with the clerkship site and made regular visits to monitor student performance. Comprehensive data searches were conducted to determine if schools in the study had any history of legal problems with state licensing boards or loan groups. Any complaint or written material sent directly to AAIMG indicating serious infractions was verified through original sources.

We are pleased to release the results of our third set of evaluations of medical

schools located in the **Caribbean Basin, Mexico, the United Kingdom** and Central America. **The Eastern European Report remains as a separate section.** The results represent expanded evaluation process and a list of deficiencies by category and evaluation objective. **A total of 24 medical schools with programs admitting U.S. students were visited by our evaluation teams. Twelve medical schools were identified as meeting or exceeding minimum criteria in all evaluation categories, 12 were deficient. There are site visits pending for two new schools in the United Kingdom.**

AAIMG does not endorse any single school or program. It is purely an information source to assist applicants in making informed, realistic choices. All prospective medical students are urged to do their own investigation and draw their own conclusions by making a personal visit to the medical admission office and the basic science campus of any foreign school in their final selection pool. **However, it is the policy of AAIMG, however, to automatically place in the deficient category any school granting advanced placement for course credit to allied health professionals such as chiropractors, podiatrists, physician assistants or nurse practitioners. Likewise, any school with significant distance learning components as part of the curriculum or part-time attendance requirements is placed in the deficient category.**

American Association of International Medical Graduates



**AMERICAN ASSOCIATION OF INTERNATIONAL MEDICAL GRADUATES**

AAIMG EVALUATION CRITERIA

SECTION    I.   Admission/Recruiting
SECTION         Practices
SECTION    II.  Basic Science Curriculum
SECTION    III. Basic Science Campus
SECTION    IV.  Student Concerns
SECTION    V.   Clinical Training Program
SECTION    VI.  Faculty
SECTION    VII. Financial
           VIII. Legal/Other



**Section I. Admission/Recruiting Practices:**

- There is an admission office with qualified staff in the United States or the country of origin.
- A published current catalog must accurately represent the medical school program, composition of the faculty, clerkship training sites and campus facilities.
- Admission criteria for selecting students are clearly defined in the catalog. The MCAT or a comparable exam should be required. School does not deviate from stated requirements.
- Pre-medical requirements consisting of essential liberal arts and science courses are listed in the school catalog. No student is admitted with fewer than 90 semester hours of undergraduate education or equivalent credits from foreign countries.
- The application fee is a nominal amount. Students should not be required to pay additional monies to receive scholarship information, loan applications, or other types of consideration, or be required to pay a substantial fee to reserve a seat.
- A designated admission committee follows a standardized evaluation and interview process. Personal interviews of each applicant are highly desirable. All applicants should be encouraged to visit the basic science campus.
- The medical school does not grant advanced placement to physician assistants, chiropractors, podiatrists, nurse practitioners, or other applicants with allied health backgrounds.
- Transfer students are vigorously screened for equivalent educational standards. The medical school does not take students dismissed from other medical schools for academic or disciplinary reasons.
- Entering classes are of a size compatible with facility size and size of the faculty. There is sufficient classroom space and housing for all incoming students.

American Association of International Medical   luates

top

Section II. Basic Science Curriculum:

- The basic science and clinical medicine curricula conform to acceptable standards of licensing boards in the United States.
- Detailed course descriptions with credit and semester hours are calculated for each course and listed in the school catalog.
- Elective courses, including research opportunities, are available to all students.
- Beginning and ending dates for each term and academic year are published in the catalog. The duration of the entire course of study leading to the Doctor of Medicine degree is not less than 38 months.
- Students must be physically present at the basic science campus for the entire term with the exception of semester breaks or school vacations.
- There is a minimum class attendance requirement published in the catalog.
- There are clearly stated goals and objectives for each course and a detailed syllabus with evaluation criteria available to the student at the beginning of each term.
- No component of the curriculum is done by distance learning. Shortened basic science terms that allow the student to return home for self-study are not acceptable.
- Academically sound standard medical textbooks are required for each course and clerkship rotation.
- A rigorous, objective examination system for each course or academic component is part of the curriculum.
- The basic science curriculum provides supervised pre-clerkship training with adequate patient and hospital exposure before students enter third year clerkships.
- Students leaving the basic science division are required to demonstrate proficiency in a standard set of core clinical skills before admission to clerkships. Evaluators of the skill base should be qualified physicians.

top

Section III. Basic Science Campus:

- The medical school campus is physically located in the country that authorized its listing by the World Health Organization.
- A permanent, independent campus is present with sufficient classrooms, labs, and equipment to meet the needs of the student body.
- Minimum lab requirements should include a gross anatomy lab with cadaver dissection, a microbiology lab, and a separate microscope lab for pathology and histology. Gross pathological specimens should be available. A physiology lab experience is highly desirable.
- There is a separate medical library area with a book and periodical collection that meets the minimum standards of a small medical school. Online resources such as Medline are available to students and faculty free of charge.
- There are facilities for quiet study time or research available to students.
- There is a designated academic dean to supervise the integrity of the basic science program.

American Association of International Medical Graduates

- An administrative office is staffed by personnel to adequately process student enrollment, keep records, and attend to routine staff and faculty needs.
- There are permanent, chaired faculty committees meeting regularly around curriculum, disciplinary, academic advancement and campus safety issues.
- Grading policies are consistent among all courses and reviewed regularly by the dean or appropriate committees.
- In the case of academic failure or grade disputes, there is a published student appeal process.
- Student evaluation of courses is conducted on a regular basis.

top

### Section IV. Student Concerns:

- The medical school is located in an environment that provides a reasonable degree of safety for the student and family members
- Sufficient, affordable, housing is available to accommodate the student and/or family members.
- Dormitory accommodations at a reasonable rate are available for students requesting this type of accommodation.
- A meal service or student snack bar is available at affordable prices.
- The medical school provides a service to assist students with off-campus housing and mediate disputes with landlords or complaints from landlords.
- A student health clinic and/or local health care resources are readily available for routine health care needs.
- Emergency medical evacuation services/insurance are offered to students at a reasonable rate.
- The medical school provides support services such as mail distribution service, community bulletin boards, newsletters, a book store etc.
- Students have free access to internet and email facilities.
- Other amenities including recreational opportunities are available to students and their families.
- An elected student government association represents student interests to the medical school administration.
- The medical school promotes an atmosphere that promotes tolerance of religious and cultural diversity.
- Academic and psychological counseling are available free of charge from qualified staff or faculty members.
- The student attrition rate for all reasons remains low throughout the curriculum.

top

### Section V. Clinical Training Program:

- The medical school requires no less than 72 weeks of clerkship training. All required clerkships should have clearly defined goals and objectives.
- There is a designated academic official to supervise the integrity of the clinical training program.
- Clerkship preceptors are given academic appointments to the medical school.